IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH (207) 713-8891 THAT IS STORED AT PREMISES OF U.S. CELLULAR | Case No.   2:23-mj-334-KFW<br><br>Filed Under Seal |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Michael Gagnon, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by U.S. Cellular, a wireless provider headquartered at 8410 West Bryn Mawr Ave., Suite 800, Chicago, IL 60631. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require U.S. Cellular to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with this account, including the contents of communications.

2.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), an agency of the U.S. Department of Justice.  I have been so employed since January 2012.  I Joined the DEA Portland Resident Office in 2018. I was assigned to the Los Angeles Division from 2012 until I was assigned to Portland. Prior to attaining

sworn status as a SA, I was employed by DEA and received specialized training in narcotics trafficking investigations and related legal matters at the DEA Training Academy in Quantico, Virginia. Before joining DEA, I was employed by the Newton Police Department in Newton, New Hampshire, from June 2009 to January 2012. During my employment with the Newton Police Department, I was a certified Peace Officer in the state of New Hampshire.  I have received law enforcement training through the Police Standards and Training Council.

3.      In the course of my employment with DEA, I have received approximately 17 weeks of training at the DEA Academy in Quantico, Virginia about techniques used by major narcotics traffickers.  I have specialized training involving the use, possession, packaging, manufacturing, sales, concealment, and transportation of various controlled substances, money laundering techniques, and conspiracy investigations. Additionally, I have attended specialized training in wire and electronic interceptions and the use of wire and electronic interception equipment.

4.      During my employment with DEA, I have participated in narcotics investigations both as a case agent and in a supportive role.  I have participated in the arrests of multiple drug traffickers and in interviewing informants and suspects concerning the methods and means of drug traffickers.  I have also participated in countless static and mobile surveillance activities and assisted in the execution of multiple search warrants and arrest warrants.  I have conducted investigations regarding these unlawful activities, violations of Sections 841(a)(1), 843(b), 846, 952(a), and 963 of Title 21 of the United States Code, and Sections 2, 1952, 1956, and 1957 of Title 18 of the United

States Code.  As a DEA agent, I primarily investigate large-scale narcotics traffickers and money laundering organizations.

5.      Based on my training and experience as a DEA special agent and Police Officer, I have become familiar with the criminal activities of individuals involved in drug trafficking organizations ("DTOs"), including drug manufacture and distribution, money laundering, and unlawful use/possession of firearms.  I have also become familiar with the methods used by such individuals to avoid detection by law enforcement, including the use of: multiple cellular telephones, including those subscribed to in the names of other persons; prepaid cellular telephones; counter-surveillance techniques; coded and ambiguous language; multiple vehicles; vehicles equipped with concealed compartments; and false identities.

6.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21 United States Code Sections 841, and 846 have been committed by Andrea Distel a/k/a Andrea Martinez ("Distel"), Luis Martinez ("Martinez"), Joey Doucette, a/k/a Joseph Doucette ("Doucette"), Patricia Hunt ("Hunt") and David Hodgkin ("Hodgkin"). In addition, there is probable cause to believe that violations of Title 18 Unites States Code Sections 922(g) and 924(c) have been committed by Martinez and Hodgkin.  There is also probable cause

3

to search the information described in Attachment A for evidence of these crimes further
described in Attachment B.

## JURISDICTION

8.     This Court has jurisdiction to issue the requested warrant because it is "a
court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a),
(b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . .
that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

9.     The DEA is conducting a criminal investigation of Martinez, Distel,
Hodgkin, Hunt, Doucette, and others regarding violations of Title 18 United States Code
Sections 922(g) (possession of a firearm by a prohibited person, 924(c) (possession of a
firearm in furtherance of a drug trafficking crime) and Title 21, United States Code,
Sections 841 and 846 (drug distribution and possession with intent to distribute and
conspiracy to possess and distribute controlled substances).

## PRIOR FBI SEARCH WARRANT FOR
## THE TARGET CELL PHONE ACCOUNT

10.     On June 26, 2021, law enforcement seized distributable quantities of
methamphetamine from Rianna Holbrook in Lewiston, Maine. Law enforcement also
seized Holbrook's Cellular telephone. On June 30, 2021, the court issued a search
warrant authorizing the Federal Bureau of Investigation ('FBI") to search Holbrook's
phone. The search resulted in the discovery of text messages related to
methamphetamine trafficking believed to be between Holbrook and David Hodgkin,
who used telephone number (207) 713-8891.

4

11.     On July 30, 2021, the court issued a search warrant authorizing the search and seizure of information associated with cellular telephone number (207) 713-8891 from U.S. Cellular. *See* Case No. 2:21-mj-193-JHR, Dkt. 1 and 2. Pursuant to the search warrant, U.S. Cellular was required to disclose text and multimedia messages and related information of cellular telephone number (207) 713-8891 generated from June 15, 2021 through July 29, 2021.

12.     Pursuant to the above-mentioned search warrant, FBI obtained data from U.S. Cellular, the service provider for telephone number (207) 713-8891. The FBI provided me with a digital copy of data received from U.S. Cellular, but I have not searched or reviewed it.

13.     I have learned from U.S. Cellular that the company retains data previously produced in response to legal process such as search warrants.

**FEBRUARY 8, 2022 INCIDENT AT WAGONWHEEL MOTEL**

14.     On February 8, 2022, officers of the Saco Maine Police Department responded to a 911 call from a female caller who reported that a male had overdosed in Room 12 of the Wagon Wheel Motel in Saco, Maine. The caller was later identified as Andrea Distel. Distel informed the dispatcher, in substance and in part, that she had administered Narcan to the male. Based on my training and experience, I am aware that Narcan is a medication which can be administered to counteract the effects of opiate drugs in a person who has overdosed on opiate drugs.

15.     Upon arriving at the motel, officers met Distel and she showed them to Room 12. Officers found Martinez in Room 12, conscious and sitting on a bed. Martinez seemed confused but was able to speak with the officers. He denied having used drugs or

alcohol, but one of the officers noted that his pupils were constricted and did not change when light was shined on them. The officers learned that Martinez was subject to two sets of bail conditions for pending state criminal charges. One of the bail conditions prohibited Martinez from possessing alcohol, drugs, and weapons, and authorized random searches of his person, residence, and vehicle for the same. Another condition prohibited Martinez from having contact with Andrea Distel.

16.     Officers searched the room pursuant to Martinez's bail conditions, and located, among other items, a backpack which contained two packages of methamphetamine, loaded Sig Sauer 9mm Pistol bearing serial no. 66A038838, a loaded Smith and Wesson Magazine, and 23 rounds of loose ammunition.[1] Martinez was placed under arrest for state drug charges.

17.     After Martinez was transported from the scene, a Saco Police Detective obtained a state search warrant authorizing the search of Room 12 at the Wagon Wheel. Officers executed the search warrant and recovered additional items from the room, including, among other items: A registration plate number 9682YU for a Cadillac CTS and a handwritten notarized note purporting to be from "David Hodgkin" which requested the release of a Cadillac CTS with VIN 1G6DP577670119925 from a Saco impound lot to Luis Martinez.

---

[1] The methamphetamine packages recovered from the backpack were later sent to a DEA laboratory where a trained chemist determined they contained a total of approximately 783 grams of methamphetamine at 97% to 98% purity.

18.    Officers located the Cadillac CTS with the above referenced VIN number parked in the parking lot of the Wagon Wheel Motel. Officers searched the Cadillac, and from the trunk recovered, among other items, a bag containing methamphetamine.[2]

19.    Based on my training and experience, the quantity of methamphetamine recovered from Room 12, and the quantity of methamphetamine recovered from the Cadillac CTS, are each consistent with further distribution and inconsistent with personal use. In addition, I am aware that Martinez has a prior felony conviction and is thus prohibited from possessing firearms.[3]

20.    On July 7, 2022, an Indictment was filed in the District of Maine, charging Martinez with two counts of possessing with the intent to distribute methamphetamine, in violation of Title 21 United States Code Section 841(a)(1) and one count of possessing a firearm as felon, in violation of Title 18 United States Code Section 922(g). *See* Case No. 2:22-cr-00086-JAW. One of the methamphetamine possession counts, and the firearm possession count concerned the February 8, 2022 incident at the Wagon wheel motel. The other methamphetamine possession count in the Indictment related to related to an incident that occurred on September 5, 2021, in which Martinez was a passenger in a vehicle stopped by law enforcement in Van Buren Maine. During the traffic stop, an officer

---

[2] The methamphetamine bag recovered from the Cadillac CTS was later sent to a DEA laboratory where a trained chemist determined it contained approximately 70 grams of methamphetamine at 97% purity.

[3] Martinez's felony convictions include, but are not limited to, a conviction for transporting methamphetamine in violation of Section 11379(a) of the Health and Safety Code of California, in Inyo County Superior Court, in Inyo County California, Case Number CRF10-49800, for which judgement entered on December 17, 2010.

patted Martinez down and felt a solid object in Martinez's pants. Martinez fled and was apprehended shortly thereafter. After Martinez was placed under arrest, law enforcement found a bag containing methamphetamine in the area where Martinez had fled.[4]

### INTERVIEWS OF DAVID HODGKIN

21.      I interviewed David Hodgkin in a non-custodial interview on May 6, 2022. During the interview, Hodgkin admitted that he sold a Cadillac CTS to a former co-worker he knew as "Bob," with a possible last name Martinez at the end of the summer of 2021.[5] Hodgkin stated that the CTS had never been registered in Bob's name. Hodgkin further stated that the CTS had been impounded the prior year (2021) and that Hodgkin had provided Bob with a notarized release giving permission for the impound lot to release the CTS to Bob. Hodgkin also stated that he'd met Bob's girlfriend before but didn't remember her name.

22.      I interviewed Hodgkin in a second non-custodial setting on June 13, 2022. During the interview, which was recorded, Hodgkin provided the following information, in substance and in part:

- Hodgkin was shown a photographic lineup and identified Martinez as "Bob;"

- Hodgkin was shown another photograph lineup in which he identified Distel as Bob's girlfriend, stating he was not positive, but was pretty sure it was her;

- Hodgkin stated that he was a felon;

---

[4] The methamphetamine recovered from the area in Van Buren where Martinez fled was later sent to a DEA laboratory where a trained chemist determined it contained approximately 366 grams of methamphetamine at 97% purity.

[5] I am aware through information from other sources that Luis Martinez commonly goes by the nickname "Bob."

- Hodgkin stated that he'd previously been a prospect with a particular motorcycle club located in Maine (the "MC"); but left the club sometime in the winter of 2020-2021 because he'd been lied to by a club member ("Person 1") about how long it would take to get patched in[6];

- Hodgkin was aware that Person 1 had lost a gun at the clubhouse, but Hodgkin wasn't there when he lost the gun;

- Hodgkin went to the clubhouse the morning after the gun was lost and helped look for it, but that they never found it;

- Hodgkin stated that the gun that Person 1 lost was a small gun, possibly a "Kimber" or a "Smith."

- Hodgkin was shown a photograph of the Sig Sauer 9mm pistol recovered from the Wagon Wheel Motel and he was unable to identify it as the lost gun;

- Hodgkin stated that none of the other members of the club knew Martinez, but that Martinez had previously met him outside in the parking lot of the clubhouse, sometime in the fall before the gun had been lost;

- Hodgkin stated he handled guns during shooting events at the club, possibly including the lost gun.

## INTERVIEWS OF PERSON 1

Person 1 was questioned in May and June of 2022. Person 1 provided the following information, in substance and in part:

- Person 1 was a member of the MC;

- Person 1 was the owner of the Sig Sauer 9mm Pistol bearing serial no. 66A038838 and had purchased it from another member of the MC;

- Person 1 had lost the Sig Sauer sometime in the winter of 2020-2021, possibly before Christmas;

---

[6] Based on my training and experience a "prospect" refers to a person seeking full membership in a motorcycle club, and "being "patched in" refers to when a person becomes a full member of such club, thus earning the right to wear certain patches signifying their membership status.

- Person 1 believed he'd been at the MC clubhouse the night when he lost the Sig Sauer, and he first realized it was missing when he woke up the following morning;

- Person 1 did not think of any MC members or anyone else could have stolen the Sig Sauer, and believed that he lost it;

- Person 1 stated that an individual known as "Hodge" was at the MC clubhouse the night the Sig Sauer had gone missing;

- Hodge told Person 1 that he hadn't seen the missing gun;

- Person 1 no longer had the same phone, but Hodge's phone number would have been listed in Person 1's phone under "David Hodgkin;"

- "Hodge" wanted to become a member of the MC, but had stopped coming around to the Club several months after the Sig Sauer went missing;

- Hodge lived in Mechanic Falls;

- Person 1 denied knowing Luis Martinez.

23.    Based on the above, there is probable cause to believe that Hodgkin provided Martinez with the Sig Sauer Pistol bearing serial number 66A038838, or alternatively, that Hodgkin aided Martinez in obtaining the pistol. I am not currently aware of any other information that could explain how Martinez came to possess the Sig Sauer Pistol that belonged to Person 1.

**INVESTIGATION INTO DISTEL ET AL**

24.    Following Martinez's arrest on February 8, 2022, the DEA continued to investigate Andrea Distel, and others. Pursuant to this investigation, it was determined that Distel, Patricia Hunt, and Joey Doucette, and others were conspiring to distribute methamphetamine in the District of Maine. This investigation is set forth in further detail in my affidavit submitted in support of a criminal complaint charging Distel, Hunt, and

Doucette with conspiring to distribute methamphetamine in violation of Title 21 United States Code Section 841(a)(1), which was filed in the District of Maine on October 13, 2022. (See 2:22-cr-141-JAW, Dkt. 3.). I have attached a copy of my affidavit submitted in support of that complaint (the "complaint affidavit") and incorporate it herein.

25.     As set forth in the complaint affidavit, September 2022, Distel arranged for Hunt to send a parcel containing methamphetamine and fentanyl to Joey Doucette at his residence Van Buren, Maine. Hunt sent the parcel to Doucette via FedEx delivery and was captured doing so in video surveillance footage from a Fed Ex Office storefront in California. On September 9, 2022, law enforcement seized the parcel, which was addressed to "Joey Doucette" at his Van Buren residence from FedEx in the District of Maine. On September 12, 2022, I searched the FedEx parcel pursuant to a federal Search Warrant. Inside the parcel I found three smaller packages wrapped in multiple layers of packaging, which were later determined to contain methamphetamine and fentanyl.[7]

26.     Doucette was arrested at his residence in Van Buren, Maine on September 13, 2023. On that date, Doucette allowed DEA TFO Thomas Lapierre to monitor and record two phone conversations with Andrea Distel. During those conversations, Distel and Doucette discussed the FedEx package that had been addressed to Doucette and why it had been delayed. In addition, in one of the recorded conversations Distel stated to

---

[7] The three packages from the FedEx parcel were later sent to a DEA laboratory where a trained chemist determined that two of the packages contained a total of approximately 845 grams of methamphetamine at 99% purity. The third package was determined to contain approximately 147 grams of fentanyl.  Based on my training and experience, these quantities of methamphetamine and fentanyl are consistent with further distribution and inconsistent with personal use.

Doucette, "I need someone to go down to Mechanic Falls and see if my friend's o.k. too, because he had something sent to him too and fuckin' I haven't been able to get a hold of him."

27.     As part of this investigation, I reviewed records from FedEx which indicated that on September 9, 2022, another package was sent via FedEx from Santa Ana, California, addressed to "Uncle Dave, 94 Maple Street, Mechanic Falls, Maine, 04246." I also reviewed surveillance footage obtained from the FedEx Office location where the parcel originated, which showed Patricia Hunt shipping a package at the location on September 9, 2022.

28.     David Hodgkin's Maine driver's license record lists his residence as 94 Maple Street, Mechanic Falls, Maine, 04256.

29.     I have reviewed subscriber information from US Cellular which indicated that telephone number (207) 713-8891 is a prepaid account listed to customer "Sam Doe" that was activated in December 2019. In addition, the email address associated with the account is hodge2569@gmail.com.

30.     I have reviewed FedEx records which indicated that another package was delivered to David Hodgkin at 94 Maple Street, Mechanic Falls, Maine, in April 2022.[8] The FedEx records further indicated the recipient phone number was listed as (207) 713-8891.

31.     Based on this investigation, I believe that Distel arranged for Hunt to send a FedEx Parcel containing controlled substances from California to David Hodgkin at his

---

[8] FedEx records appear to indicate that the sender was an automotive parts supply company.

residence in Mechanic Falls, Maine. Based on the quantity of Methamphetamine (845 grams) and fentanyl (157 grams) Distel and Hunt previously sent to Doucette, it is likely that the package sent to Hodgkin contained a similar quantity of controlled substances.[9] Accordingly, I believe that any controlled substances sent to Hodgkin were sent for the purpose of further distribution by Hodgkin and/or others.

<u>FURTHER BACKGROUND AND TRAINING AND EXPERIENCE OF AFFIANT</u>

32.     Based on my training and experience, and conversations with other law enforcement agents who have conducted controlled substance distribution investigations, I know the following:

a.   Distributors of controlled substances often communicate with their co-conspirators using cellular phones and often use multiple cellular telephones to compartmentalize their operations or to avoid detection by law enforcement;

b.   Distributors of controlled substances frequently use these cellular telephones to send text messages, emails, and digital photographs to their co-conspirators in furtherance of their criminal activity, including both drug trafficking and the laundering of drug proceeds.

33.     Based on my training and experience, I am also aware that controlled substance distributors often utilize firearms to protect their supplies of controlled substances and proceeds from selling controlled substances. Further, controlled

---

[9] In addition, I have reviewed Fed Ex records showing that the package sent to Joey Doucette at his residence in Van Buren on about September 8, 2022, weighed 3 pounds, and the package sent to "Uncle Dave" at 94 Maple Street in Mechanic Falls, on September 9, 2022, also weighed three pounds.

substance distributors, particularly those who are felons and unable to legally possess or purchase firearms, often seek to obtain firearms from private sellers who do not conduct background checks. In addition, I am aware that controlled substance distributors are also known to accept firearms in exchange for controlled substances.

34.     In my training and experience, I have learned that U.S. Cellular is a company that provides cellular telephone access to the public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for U.S. Cellular subscribers may be located on the computers of U.S. Cellular.

35.     Wireless phone providers often provide their subscribers with voicemail services.  In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail.  If the subscriber does not delete the message, the message may remain in the system of the wireless service provider for weeks or months.

36.     Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers.  This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging" or "wireless messaging."

37.     Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems.  This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of

14

session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages.  Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

38.    Many wireless providers retain information about the location in which a particular communication was transmitted or received.  This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

39.    Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages.  A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received.  The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to

obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

40.     Wireless providers also maintain business records and subscriber information for particular accounts.  This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifiers for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers.  In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed).  The providers may also have payment information for the account, including the dates and times of payments and the means and source of payment (including any credit card or bank account number).

41.     In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user because of the communications.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

42.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by

using the warrant to require U.S. Cellular to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

43.   Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of these warrants.

44.   The government will execute the warrant by serving it on U.S. Cellular. Because the warrant will be served on U.S. Cellular, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

45.   Based on the forgoing, I request that the Court issue the proposed search warrant.

Respectfully submitted,

Michael Gagnon
Special Agent
Drug Enforcement Administration

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedures

Date:  Nov 27 2023

City and state:  Portland, Maine

Judge's signature

Karen Frink Wolf,  U.S. Magistrate Judge
Printed name and title

17